THE STATE OF MONTANA, Plaintiff and Appellant, *v.* JACK
M. SCANLON, Defendant and Respondent.

No. 13476.
Submitted Oct. 21, 1976.
Decided Dec. 30, 1976.
Submitted On Rehearing Feb. 23, 1977.
On Rehearing Aug. 24, 1977.
As Corrected Oct. 5, 1977.
569 P.2d 368.

Robert L. Woodahl, Atty. Gen., Thomas A. Budewitz argued, Asst. Atty. Gen., Albert Meloling argued, Special Asst. Atty. Gen., Helena, for plaintiff and appellant.

Donald A. Garrity argued, Helena, for defendant and respondent.

MR. JUSTICE JOHN C. HARRISON, delivered the opinion of the Court.

The state appeals from dismissal of eighteen counts of perjury returned by the grand jury against Jack M. Scanlon, defendant. The grand jury in Lewis and Clark County initiated an investigation into defendant's Workers' Compensation related activities. The foreman of the grand jury stated:

"* * * Pursuant to this inquiry, the Grand Jury will examine the activities of Jack Scanlon in his representation of claimants before the Industrial Accident Board and the Workmen's Compensation Division during the period between mid-1969 and mid-1973 and thereafter.

"This inquiry will include a review of each step of Mr. Scanlon's professional representation, commencing with initiation of the attorney-client relationship and continuing through the conclusion of such representation, including any related third-party litigation involving subrogation rights."

As a part of this investigation a number of defendant's clients were called and testified to the manner the attorney-client relationship was initiated. After this testimony, the grand jury requested the attorney general to file a complaint with the Commission on Practice charging defendant did solicit without legal cause or permission, the individuals who testified.

Defendant was called to testify before the grand jury and refused to answer questions posed to him asserting his right against self-incrimination. Thereafter, in an effort to find where defendant received the information, defendant was granted immunity against prosecution except prosecution for contempt and perjury. He testified for two days before the grand jury, denying he solicited

those persons-and offered explanation for the manner in which they became his clients. Following defendant's testimony there was further inquiry and some clients were recalled. Some people, whom defendant said referred these clients to him, were called to testify. The grand jury returned an indictment charging eighteen counts of perjury.

Defendant filed a motion to dismiss these charges, which was granted. The state appeals.

We summarize the issues presented to be:

1. Whether the evidentiary standard required for proof of perjury was met?

2. Whether the allegedly perjured testimony was material?

3. Whether off-the-record statements made to the grand jury were grounds for dismissal?

4. Whether there was sufficient prosecutorial misconduct to warrant dismissal of the indictment?

5. Whether the admonition of secrecy delivered to the grand jury witnesses was grounds for dismissal?

First, we consider the strict evidentiary standard required for the proof of perjury. Three Montana statutes are applicable:

Section 94-7-202(7), R.C.M. 1947, provides:

"No person shall be convicted of any offense under this section where proof of falsity rests solely upon the testimony of a single person other than the defendant."

Section 93-401-1, R.C.M. 1947, provides:

"The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason."

Section 93-1401-2, R.C.M. 1947, provides:

"Perjury and treason must be provided by testimony of more than one witness; treason by the testimony of two witnesses to the same overt act; and perjury by the testimony of two witnesses, or one witness and *corroborating circumstances*." (Emphasis added.)

The basis for unusually stringent evidence requirements is set out

in an article in 19 UCLA Law Review 638, 642, 643 entitled "Perjury and Related Offenses Under the Proposed California Criminal Code." That same article points out at p. 645, that Tentative Draft No. 6 of the Model Penal Code on this point reads:

"Corroboration. Proof of guilt beyond a reasonable doubt shall suffice for conviction under this section as in other criminal cases, without special requirement of two witnesses or corroborating circumstances.

"[*Alternate*, rejected by the council: No person shall be convicted of an offense under this Section where proof of falsity rests solely upon contradiction by testimony of a person other than the defendant.]"

The official draft of the Model Penal Code, which served as the basis for section 94-7-202(7), R.C.M. 1947, used the alternate provision. In Montana Criminal Code, 1973, Annotated, Prof. William F. Crowley—Editor, at page 293 the annotator points out:

"The common law rule that falsehood be established by two witnesses is adopted in part by subsection (7). At the common law this rule was adopted to deal with the problem of an oath against an oath. The modern rationale is a policy determination based on a balancing of the need for protection of witness and the need to maintain the sanctions for false testimony. In adopting the requirement of more than one witness Montana has followed the majority of states in affording additional protection to the witness at the possible cost of being unable to convict an apparent perjurer. * * *"

As noted above, the standard of proof required in Montana under the new code section 94-7-202(7), R.C.M. 1947, requires that the proof of the falsity of a statement must be more than the contradiction testimony of a person other than the defendant. The legislature recently made this policy determination and despite the contrary rule urged by the state, this is the rule in Montana.

The exact requirements of this evidentiary rule in perjury cases are apparent from an examinataion of the California cases inter-

preting the section of the California Civil Code, identical to Montana's section 93-1401-2, R.C.M.1947. In an article entitled "Proof of Perjury: The Two Witness Requirement", 35 Southern California Law Review 86, 97, it is stated:

"In summary, the California attitude is, and remains, that direct testimony of at least one witness must always be introduced to prove the falsity of the statement set forth in the indictment; circumstantial evidence alone will not support a perjury conviction."

*In People v. Roubus*, 65 Cal.2d 218, 53 Cal.Rptr. 281, 282, 417 P.2d 865, 866, 867, the California Supreme Court, sitting In Bank, outlined this evidentiary requirement:

"Perjury must be provided by the testimony of two witnesses, or of one witness and corroborating circumstances. * * * This statutory provision has been interpreted as prescribing not only the amount but also the kind of evidence necessary to support a perjury conviction. * * * Direct, as distinguished from circumstantial, evidence of the falsity of the defendant's testimony by at least one witness is generally required. * * * This does not mean that there must be a denial in the very words of the defendant's testimony * * * but that there must be testimony by at least one witness furnishing direct evidence of facts contrary to, or absolutely incompatible or physically inconsistent with, that sworn to by the accused * * *. Evidence that establishes facts from which the falsity of an alleged perjured statement may or may not be inferred is insufficient under the direct evidence rule. * * *

"The rule requiring proof of falsity by direct evidence has been criticized. * * * However, this requirement was early established in this state by decisions construing our statutory provision. It is noteworthy that a majority of jurisdictions which apply the rule that falsity must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances, hold that circumstantial evidence alone is generally insufficient to establish falsity."

An early Montana case indicates this is the law in Montana as well. In *State v. Gibbs*, 10 Mont. 213, 219, 25 P. 289, 290, it is said:

" 'It is not necessary that there should be two living witnesses in contradiction of the statement of the defendant to justify a conviction of perjury. It is sufficient if, in addition to one directly opposing witness, corroborating circumstances, sufficient to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence are proved.' "

The Court in *Gibbs* approved this instruction as to proof of perjury:

" '* * * that such act of perjury has been established to your satisfaction beyond a reasonable doubt by more than one witness, or that the testimony of such witness has been corroborated upon that point by other facts and circumstances proved on the trial. In other words, the direct evidence of one witness alone is not sufficient to convict of the crime of perjury, unless corroborated by other facts and circumstances provided on the trial.' "

In *Gibbs* the Court was construing the then equivalent code section to section 93-401-1, R.C.M.1947. Section 93-401-2 had not been enacted at that time. In *State v. Jackson*, 88 Mont. 420, 293 P.309, the Court cited *Gibbs* as authority of the requirement that perjury must be provided by the testimony of two witnesses, or one witness and corroborating circumstances indicating that this was the law even prior to the passage of section 93-401-2, R.C.M.1947.

A subsidiary question to be determined regards the nature of the corroborating circumstances that must be proved. The rule in California, that the state argues we should adopt, is stated in *People v. Cassanova*, 54 Cal.App. 439, 202 P. 45, 47:

"* * * The statue respecting the quantum of evidence necessary in perjury cases will be satisfied, if there be the testimony of one witness to facts that are absolutely incompatible with the innocence of the accused, corroborated by circumstances which, of themselves and independently of such directly inculpatory evidence, tend, with a reasonable degree of certitude, to show that the accused is guilty as charged."

See also: *People v. Pustau*, 39 Cal.App.2d 407, 103 P.2d 224, 228.

146

In *Gibbs* the Court said that "corroborating circumstances suffi-cient to turn the scale, and overcome the oath of the defendant and the legal presumption of his innocence" are all that is required. In *People v. Todd*, 9 Cal.App.2d 237, 49 P.2d 611, 614, it is pointed out:

"It is also well settled that motive and design to commit a crime, if proved, may be considered a guilty circumstance * * * and con-sequently may serve legally as corroborative evidence; and in this behalf it has been repeatedly held that where, as here, it is claimed that several offenses have been committed as part of one scheme or plan, all of the same general character, tending to the same com-mon end, evidence thereof may be received to show the process or motive and design to commit the particular offense with which the accused is charged, and as tending to show logically that the par-ticular offense for which he is being tried was part of such common scheme."

The second issue involves the requirement that the alleged per-jured statement be material. The Montana statue, section 94-7-202(3), R.C.M.1947, provides:

"Falsification is material, regardless of the admissibility of the statement under rules of evidence, if it could have affected the course or outcome of the proceeding. It is no defense that the declarant mistakenly believed the falsification to be immaterial. Whether a falsification is material in a given factual situation is a question of law."

The Commission Comment points out:

"The proposed definition of 'materiality' in subsection (3) does not differ substantially from that given by prior law."

In *State v. Hall*, 88 Mont. 297, 304, 292 P. 734, 735, the Court said:

"* * * Also it may be conceded that the general rule is that anything so connected with the matter at issue as to have a legitimate tendency to prove or disprove some material issue by giving weight or probability to, or detaching from, the testimony

of a witness, is material * * * and that, if evidence is circumstantially material, it is sufficient to sustain a perjury charge."

The test for materiality as set out by the statute is not particularly difficult to meet, it requires only that in the actual factual situation involved would it be reasonable to find that the defendant's statement, if believed, could have altered the course of investigation.

While it is true that a false answer to a trivial or irrelevant question does not in and of itself hamper the functioning of the state, the court, whose integrity depends on the truth, has a special interest in seeing those who do not tell the truth, whether to a relevant or irrelevant matter, do not go unpunished. See section 94-7-203, R.C.M.1947, which provides for the punishment of a false statement in an official proceeding whether that statement was material or not, and makes such false statement a misdemeanor.

We note here that nearly all cases cited by both parties involve a post-trial, not post-indictment determination of these required elements. We are considering here perjury counts before a grand jury and not after a trial. The grand jury statute, section 95-1408(c), R.C.M.1947, provides:

"The grand jury shall find an indictment when all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, warrant a conviction by a trial jury."

The district court dismissed each of the eighteen counts based on the absence of one the these elements—lack of direct evidence as to the falsity of the statement, lack of corroboration or lack of materiality. Several of the counts against defendant arose out of transactions wherein defendant testified the clients were referred to him by an uncle and aunt, Mr. and Mrs. Herman Meyers, long time family friends. At the time defendant testified all of these people were deceased. The clients who appeard before the grand jury denied ever knowing any of the named people, however, these deaths prevented the state from getting the necessary direct evidence required to prove perjury. The district court dismissed

these counts for lack of direct evidence as to the falsity and these dismissals were proper.

We have carefully reviewed all other counts, and hold that with the exception of counts 9 and 10, they should have been dismissed. The dismissal of those counts comes from the fact they were not supported by dirtect evidence of the falsity of the defendant's statements or due to the lack of sufficient proof to offset defendant's failure to remember certain facts.

A summary of count 9 charges that Jack M. Scanlon, falsely testified that Grace A. Rieker first contacted him on the telephone, when in truth and fact he knew that he had instigated the telephone conversation with claimant for the purpose of initiating a client-attorney relationship and that he so testified to decieve and frustrate the grand jury in its investigation contrary to section 94-7-202, R.C.M.1947.

A summary of count 10 charges that defendant falsely testified that prior to the telephone call from claimant he had never heard of the claimant nor the fact that she was injured, while in truth and fact he knew the claimant and that she had been injured prior to ever talking to her, and he so testified for the purpose of deceiving and frustrating the grand jury contrary to section 94-7-202, R.C.M.1947.

When asked how he came to represent Mrs. Grace Rieker and her claims before the Industrial Accident Board, defendant in answer to questions testified:

"Q. How did she come to know you? A. I don't know you will have to ask her that.

"Q. The first contact with Grace Rieker was by her telephoning you? A. As I recall, yes.

"Q. Let me give you your files, in case you need them to refresh your memory. Did she call you in your office in Helena? A. As I recall, yes.

"Q. What did she say to you? A. She asked me about, as I recall, representing her in her industrial accident claim.

"Q. Now which claim was this? A. As I recall, there were two claims. One was for a neck injury, and she called me relative to that?

"* * *

"Q. All right. In response to her phone call, what did you do? A. I met with her.

"Q. Where? A. In Boulder.

"* * *

"Q. And who was present? A. I think her husband was, but I am not sure.

"* * *

"Q. Now, this was the very first contact that you ever had with her, was when she phoned you? A. As best I can recall, yes.

"Q. And prior to her phoning you, you had never heard of Grace Rieker or her injury or anything else? A. No.

"Q. But, you are confident that you did not solicit the attorney-client relationship yourself? A. Yes, I am confident I didn't solicit the attorney-client relationship myself."

Mr. Fuller testified as to his recollection of the Rieker case indicating he and defendant were high school friends and they had kept that relationship going over the years. He said that after he had talked with investigators of the Workmen's Compensation investigation team, and just before he testified before the grand jury, he called Scanlon about the Rieker case because it was one they had asked questions about. He testified:

"Q. Well, did you check with him to make sure that his recollection of the Grace Rieker incident was the same as yours? Just to make sure that in your own mind that your memory- - - A. Yes I did.

"Q. So you went through with him how he developed his relationship with Grace Rieker in so far as you were concerned? A. The only thing I asked him was related to if he recalled that there were two calls made by me if I ever told him that, or if he had made a phone call from my home.

150

"Q. What did he say? A. He said no.

"\* \* \*

"Q. In other words, according to what Scanlon told you on the phone on March 26th, Grace Rieker made the first contact with Scanlon? A. Yes.

"Q. And it was either that she phoned him, asking for assistance of an attorney- - -right? A. Right.

"Q. —or that she came to his office? A. Right.

"Q. But did he tell you that in no way that he contacted Grace Rieker, telephoned her, or through, talked to her? A. Right."

Fuller also testified he did not remember either giving the Riekers the phone number of Scanlon: or giving Scanlon the Riekers' number.

Mrs. Rieker testified before the grand jury that she was a secretary-receptionist at the Boulder River School and on December 22, 1967, she had slipped down the school steps and received an injury that incapacitated her for a period of time. For that period she received no compensation other than from her sick leave. She returned to work and several years later on June 18, 1970, she was injured and from this injury she received compensation on an off and on basis. She testified that during her recovery a Mr. Ron Fuller of Boulder asked her if she was interested in a lawyer to help her get her industrial accidents payments. He told her he had a friend that was a lawyer and would she like him to come to talk to her.

Her testimony on the Fuller calls was:

"Q. As a result of this difficulty, did someone make a contact with you? Did some attorney make a contact with you, either personally or through someone else? A. Yes.

"Q. And what was the name of that attorney? A. Mr. Jack Scanlon.

"Q. Prior to this contact being made to you, had you ever personally known Scanlon? A. No.

"Q. How did this initial contact regarding Scanlon take place. A. A gentleman by the name of Ron Fuller- - -

"* * *

"Q. So Fuller volunteered over the phone that he had a friend who was a lawyer and might be able to help you? A. Yes.

"* * *

"Q. Now did you have additional problems with the Industrial Accident Board? A. Yes.

"Q. Did you, as a result of those additional problems say, hey, I remember that fellow Scanlon and go and call Scanlon? A. No.

"Q. Were you contacted a second time? A. Yes.

"Q. And who did this? A. Mr. Fuller again.

"Q. All right. And was this without a request on your part? A. Yes.

"* * *

"Q. Was there anybody else there with Fuller at that time? A. Yes.

"Q. Who was that? A. Mr. Scanlon.

"Q. And how do you know that? A. Because Mr. Fuller asked me if I would like to talk to him on the phone and I said, well, I supposed I could talk with him about my problem, so I did talk to him on the phone.

"* * *

"Q. Okay, so what did Scanlon say when he got on the phone? A. Told me he would like to handle my case, he had heard about it, was interested in it and thought he could help me.

"* * *

"Q. Did he eventually come over to your house? A. Yes.

"Q. And when he talked with you, did he seem to know the details of your current accident? A. Yes.

"Q. How did he learn about the 1967 accident? A. He asked me at that point if I had ever had a previous injury, and I said yes."

Al Rieker, husband of Grace, testified corroborating her

testimony that after her 1971 injury she was contacted by Ron Fuller about whether she needed a lawyer and they told him "no". About the second contact by Fuller he testified:

"Q. * * * Now, at a later time do you recall being home when the telephone rang? A. Yes.

"Q. Did you answer or did your wife? A. My wife answered it.

"Q. * * * Now, after she finished talking on the phone did she tell you who had called? A. Yes, she did.

"Q. And who did she say? A. She said Ron had called and he had put Jack Scanlon on and she talked to Jack Scanlon.

"Q. While you were in the house? A. Yes.

"* * *

"Q. All right. Did Scanlon eventually come over to your home? A. Yes, he did.

"Q. Now, when Scanlon came to your home, did he tell you what the reason was that he talked to your wife over the phone? A. Yes, he did. He said he had been in contact with Ron Fuller and they had talked over our case and thought we needed a lawyer, or that he might help.

"Q. That he, Scanlon might help? A. Yes.

"Q. Okay. So that Scanlon told you he had found out about your wife's claim before talking to your wife, from Fuller himself. A. Right.

"Q. And that was the reason that he had talked to your wife on the phone? A. That is correct.

"Q. And then later on, at a later time, he came to your house and he confirmed that to you. A. Yes.

As to these counts there are clearly contradictory statements to defendant's testimony that prior to actually speaking to Grace Rieker, he was both unaware of the claimant or her injuries. The necessary corroboration is provided by the testimony of Al Rieker, whose testimony was that defendant came to the Rieker home and told them that before talking to Grace Rieker he had been in contact with Ron Fuller and had talked over the Grace Rieker injuries.

Such testimony is adequate to corroborate that he knew of her injury from Fuller, prior to coming to the Rieker home.

The remaining three issues do not go to the actual merits of the charges individually but they alleged general procedural and prosecutorial improprieties as the basis for the dismissal of all charges against defendant. These attacks must be viewed against the function of the grand jury. In *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 618, 38 L.Ed.2d 561, 569, the United States Supreme Court pointed out:

"A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person."

These alleged improper procedures do not reach the merits of the individual charges but rather attack the matter in which the otherwise valid criminal charges are determined and instituted and are a weak basis for asking for dismissal of the charges.

The first of these is the request that the criminal charges be dismissed for off-the-record statements made by the special assistant attorneys general prior to the returning of the indictment. There was no record of what was said because the statute, section 95-1406(e)(1), R.C.M.1947, requires only that the testimony of witnesses be recorded. This session, characterized by the district court as a "prep session", could not have resulted in the grand jury returning improper or unsupported indictments. The state urged the district court to limit its examination to the probable cause and the evidentiary support for each count. The district court said it "would prefer to do so and leave the matter up to the committee on practice but we can not overlook the devastating effect of the grand jury indictment of the person charged."

While this Court does not overlook the effect of the indictment, it cannot uphold the dismissal of otherwise valid criminal counts because of possible improper statements made to the grand jury

prior to the indictment. The merits of invalid counts may be challenged individually and the defendant's rights thus protected.

The same may be said of the allegation that there was sufficient prosecutorial misconduct to warrant dismissal of the indictment. Nothing in the record here approaches this level.

The admonition of secrecy that was given to witnesses before the grand jury was not proper because it did not follow the procedure outlined in section 95-1409, R.C.M.1947. However, the requirement was lifted after indictment so that defendant's ability to prepare his defense has not been impaired. The district court did not expressly base dismissal of the charges on this error, it said:

"While this apparent utter disregard for the orders of this court and the requirements of the law may not have demonstrably prejudiced the defendant, it is nevertheless suspect as an unauthorized intimidation of witnesses by the State, which could, if left standing or further ignored redound to the prejudice of the defendant. This should not be condoned or disregarded in considering whether the indictment should be dismissed."

Under the circumstances disclosed here; the error is not that fatal.

The two remaining valid charges are remanded to the district court for trial on the merits.

MR. CHIEF JUSTICE JAMES T. HARRISON, JUSTICE HASWELL, and L. C. GULBRANDSON, District Judge, sitting for Justice Castles, concur.

MR. JUSTICE DALY, dissenting.

I dissent:

There will be a change in the makeup of this Court on January 3, 1977. Therefore the Court as presently constituted must complete its work assignments no later than Thursday, December 30, 1976 at 5:00 p. m.

The majority opinion in this case was delivered to my chambers for study and comment Wednesday, December 29, 1976. I was not,

previous to receipt of this opinion, accorded an opportunity to join with the Court in conference regarding their views or to express mine. I have been present at Court at all times during which the majority view could have been reached and reduced to writing.

Obviously the time required to research and properly prepare a responsible legal dissent to the majority's position is no longer available.

Therefore, I would advise that I have strong views that differ from the majority position and wish to reserve the right to prepare and file them at a later date.

## ON REHEARING

MR. JUSTICE SHEA,

This case involves proceedings before a grand jury in Lewis and Clark County in which the defendant was indicted on 18 counts of perjury relating to his testimony before the grand jury as to how his clients who had industrial accident claims came to him. In *State v. Scanlon*, 33 St.Rep. 1355 (December 30, 1976), this Court affirmed the dismissal of 16 of the 18 counts by the district court, but ordered a trial on two of the counts (counts 9 and 10). Thereafter, defendant petitioned for a rehearing, and the state petitioned for a rehearing, the thrust of both was that the defendant and the state requested a dismissal of all 18 counts of perjury. This Court granted the petitions for rehearing.

As part of the grand jury investigation into the handling of industrial accident claims by the Industrial Accident Board and by attorneys in Montana, the grand jury called defendants to testify as to how the attorney-client relationship was initiated. The purpose of this inquiry was to determine if there were leaks from the Industrial Accident Board to certain lawyers in Montana concerning persons in Montana who had filed industrial accident claims with the Board. The focus was whether anyone within the Industrial Accident Board either referred claimants to the defendant or whether they provided him with names of claimants who would be potential clients.

When he was first called to testify before the grand jury, defendant refused to answer questions asked him, asserting his right against self-incrimination. Thereafter, in an effort to find how defendant acquired his clients, the grand jury granted immunity against prosection to the defendant except prosecution for contempt and perjury. For two days defendant testified before the grand jury, and denied he solicited his clients and explained how they became his clients. As a result of this testimony the grand jury indicted defendant on 18 counts of perjury.

The district court dismissed each of the 18 counts based either on lack of direct evidence as to the falsity of the statement, lack of corroboration as to the falsity of the statement, or lack of materiality.

Several of the counts against defendant arose out of transactions where defendant testified the clients were referred to him by an uncle and aunt, Mr. and Mrs. Richard Mullins, or by Mr. and Mrs. Herman Myers, long-time family friends. At the time of his testimony before the grand jury, all of these persons had died. The clients who appeared before the grand jury denied ever knowing any of the people named. The district court dismissed these counts for lack of direct evidence as to the falsity. These dismissals were proper. These counts were not supported by direct evidence of the falsity of the defendant's statements.

This appeal concerns the evidentiary standard required for the proof of perjury, which essentially revolves around three statutes.

Section 94-7-202(7), R.C.M.1947, provides:

"No person shall be convicted of an offense under this section where proof of falsity rests solely upon the testimony of a single person other than the defendant."

Section 93-401-1, R.C.M.1947, provides:

"The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason."

Section 93-1401-2, R.C.M.1947, provides:

"Perjury and treason must be proved by testimony of more than one witness; treason by the testimony of two witnesses to the same

overt act; and perjury by the testimony of two witnesses, or one witness and *corrob*orating circumstances." (Emphasis added.)

The basis for unusually strigent evidence requirements is set out in an arcitle in 19 UCLA Law Review 638, 642, 643 entitled "Perjury and Related Offenses Under the Proposed California Criminal Code." That same article points out at p. 645, that Tentative Draft No. 6 of the Model Penal Code on this point reads:

"Corroboration. Proof of guilt beyond a reasonable doubt shall suffice for conviction under this section as in other criminal cases, without special requirement of two witnesses or corroborating circumstances.

"[Alternate, rejected by the council: No person shall be convicted of an offense under this Section where proof of falsity rests solely upon contradiction by testimony of a person other than the defendant.]"

The official draft of the Model Penal Code, which served as the basis for section 94-7-202(7), R.C.M.1947, used the alternate provision. In Montana Criminal Code, 1973, Annotated, Prof. William F. Crowley—Editor, at page 293 the annotator points out:

"The common law rule that falsehood be established by two witnesses is adopted in part by subsection (7). At the common law this rule was adopted to deal with the problem of an oath against an oath. The modern rationale is a policy determination based on a balancing of the need for protection of witness and the need to maintain the sanctions for false testimony. In adopting the requirement of more than one witness Montana has followed the majority of states in affording additional protection to the witness at the possible cost of being unable to convict an apparent perjurer. * * *"

As noted above, the standard of proof required in Montana uder the new code section 94-7-202(7), R.C.M.1947, requires that the proof of the falsity of a statement must be more than the contradiction testimony of a person other than the defendant. The legislature recently made this policy determination and despite the contrary rule urged by the state, this the rule in Montana.

The exact requirements of this evidentialry rule in perjury cases are apparent from an examination of the California cases interpreting the section of the California Civil Code, identical to Montana's section 93-1401-2, R.C.M. 1947. In an article entitled "Proof of Perjury: The Two Witness Requirement", 35 Southern California Law Review 86, 97, it is stated:

"In summary, the California attitude is, and remains, that direct testimony of at least one witness must always be introduced to prove the falsity of the statement set forth in the indictment; circumstantial evidence alone will not support a perjury conviction."

In *People v. Roubus*, 65 Cal.2d 218, 53 Cal.Rptr. 281, 417 P.2d 865, 866, 867, the California Supreme Court, sitting In Bank, outlined this evidentiary requirement:

"Perjury must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances. * * * Direct, as distinguished from circumstantial, evidence of the falsity of the defendant's testimony by at least one witness is generally required. * * * This does not mean that there must be a denial in the very words of the defendant's testimony * * * but that there must be testimony by at least one witness furnishing direct evidence of facts contrary to, or absolutely incompatible or physically inconsistent with, that sworn to by the accused * * *. Evidence that establishes facts from which the falsity of an alleged perjured statement may or may not be inferred is insufficient under the direct evidence rule. * * *

"The rule requiring proof of falsity by direct evidence has been criticized. * * * However, this requirement was early established in this state by decisions construing our statutory provision. It is noteworthy that a majority of jurisdictions which apply the rule that falsity must be proved by the testimony of two witness, or of one witness and corroborating circumstances, hold that circumstantial evidence alone is generally insufficient to establish falsity."

An early Montana case indicates this is the law in Montana as

well. In *State v. Gibbs*, 10 Mont. 213, 219, 25 P. 289, 290, it is said:

" 'It is not necessary that there should be two living witnesses in contradiction of the statement of the defendant to justify a conviction of perjury. It is sufficient if, in addition to one directly opposing witness, corroborating circumstances sufficient to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence are proved.' "

The Court in *Gibbs* approved this instruction as to proof of perjury:

" '* * * * that such act of perjury has been established to your satisfaction beyond a reasonable doubt by more than one witness, or that the testimony of such witness has been corroborated upon that point by other facts and circumstances proved on the trial. In other words, the direct evidence of one witness alone is not sufficient to convict of the crime of perjury, unless corroborated by other facts and circumstances proved on the trial.' "

In *Gibbs* the Court construing the then equivalent code section to section 93-401-1, R.C.M.1947. Section 93-1401-2 had not been enacted at that time. In *State v. Jackson*, 88 Mont. 420, 293 P. 309, the Court cited *Gibbs* as authority of the requirement that perjury must be proved by the testimony of two witnesses, or one witness and corroborating circumstances indicating that this was the law even prior to the passage of section 93-1401-1, R.C.M.1947.

A subsiciary question to be determined regards the nature of the corroborating circumstances that must be proved. The rule in California, that the state argues we should adopt, is stated in *People v. Casanova*, 54 CalApp. 439, 202 P. 45, 47:

"* * * The statute respecting the quantum of evidence necessary in perjury cases will be satisfied, if there be the testimony of one witness to facts that are absolutely incompatible with the innocence of the accused, corroborated by circumstances which, of themselves and independently of such directly inculpatory evidence, tend, with a reasonable degree of certitude, to show that the accused is guilty as charged."

See also: *People v. Pustau*, 39 Cal.App.2d 407, 103 P.2d 224, 228.

In *Gibbs* the Court said that "corroborating circumstances sufficient to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence" are all that is required. In *People v. Todd*, 9, Cal.App2d 237, 49 P.2d 611, 614, it is pointed out:

"It is also well settled that motive and design to commit a crime, if proved, may be considered a guilty circumstance * * * and consequently may serve legally as corroborative evidence; and in this behalf it has been repeatedly held that where, as here, it is claimed that several offenses have been committed as part of one scheme or plan, all of the same general character, tending to the same common end, evidence thereof may be received to show the process or motive and design to commit the particular offense with which the accused is charged, and as tending to show logically that the particular offense for which he is being tried was part of such common scheme."

The second issue involves the requirement that the alleged perjured statement be material. The Montana statute, section 94-7-202(3), R.C.M.1947, provides:

"Falsification is material, regardless of the admissibility of the statement under rules of evidence, if it could have affected the course or outcome of the proceeding. It is no defense that the declarant mistakenly believed the falsification to be immaterial. Whether a falsification is material in a given factual situation is a question of law."

The Commission Comment points out:

"The proposed definition of 'materiality' in subsection (3) does not differ substantially from that given by prior law."

In *State v. Hall*, 88 Mont. 297, 304, 292, P. 734, 735, the Court said:

"* * * Also it may be conceded that the general rule is that anything so connected with the matter at issue as to have a

legitimate tendency to prove or disprove some material issue by giving weight or probability to, or detracting from, the testimony of a witness, is material * * * and that, if evidence is circumstantially material, it is sufficient to sustain a perjury charge."

The test for materiality as set out by the statute is not particularly difficult to meet, it requires only that in the actual factual situation involved would it be reasonable to find that the defendant's statement, if believed, could have altered the course of the investigation.

■ The grand jury statute, section 95-1408(c), R.C.M.1947, provides:

"The grand jury shall find an indictment when all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, warrant a conviction by a trial jury."

While it is the right of the grand jury to return an indictment, it is, nevertheless, the duty of the courts to determine if there was the required minimum evidence to prove each of the elements of the charge of perjury. Both sides conceded here that there was no more evidence which could go before a trial jury than what the grand jury had already heard. Accordingly, this is not a situation where the indictment is faulty but where the defendant can be reindicted. Rather, it is a situation where if the indictment is faulty, the defendant cannot again be indicted because there is no other evidence to present to the grand jury.

This Court has carefully reviewed all counts and conclude that all counts were properly dismissed. Sixteen of the 18 counts were situations where they were not supported by direct evidence of the falsity of defendant's statements. However, counts 9 and 10 deserve more attention in discussing our reasons for their dismissal.

The two charges are summarized as follows:

At trial the state offered evidence to prove that defendants met in Billings, Montana on April 5, 1975 and conspired to rob the Safeway grocery store in Hardin, a small community 50 miles south of Billings. The state offered direct and circumstantial evidence tend-

ing to prove that on the evening of April 5, 1975 defendants Fitzpatrick and Radi drove to Hardin in Radi's automobile, while Holliday, Bad Horse and Bushman together drove to Hardin in another automobile. Defendants parked in front of the Safeway store and waited until closing time when Everett Stoltz, the store manager, and Monte Dyckman, a store employee locked the store doors and drove away in different automobiles. Fitzpatrick and Radi followed the store manager. The remaining defendants purportedly followed Monte Dyckman but lost sight of him when he stopped at the post office to deposit mail. When the store manager drove to his home, Radi and Fitzpatrick realized the store receipts were carried by Dyckman and they proceeded to the bank where the deposit was to be dropped. It is alleged Fitzpatrick and Radi abducted Monte Dyckman at the bank, prior to his depositing the store's receipts, robbed him, and then killed him in the vicinity of the Toluca Interchange, 12 miles west of Hardin, within the boundaries of Big Horn County.

Defendants raise numerous issues on appeal. We hold the judgments of conviction must be reversed and the causes remanded for new trials. Therefore, we discuss only the following issues to insure that we do not comment on matters to come before the district court in a new trial:

I. Whether the Montana statutory provisions for jury selection are constitutionally valid and, if so, whether the jury in the instant case was selected and drawn in substantial compliance with the law?

II. Whether the defendants were prejudiced by the joinder of their trials?

III. Whether there was sufficient corroboration of defendant Bushman's testimony?

IV. Whether the convictions of defendants Holliday and Bad Horse should be reversed and the charges against them dismissed on the grounds the jury was inadequately instructed on the applicable law and returned to inconsistent verdicts?

Issue I. Defendants initially contend their convictions should be

reversed and the causes remanded on the grounds the Montana statutory provisions for selecting jurors is unconstitutional and, even if the statute is found to be constitutional, that the jury panels in the instant case were selected and drawn in total disregard of the applicable Montana law. Section 95-1908, R.C.M.1947, sets forth the procedure in challenging the selection of a jury panel:

*"Motion to discharge jury panel.* (a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel. The motion shall be made at least five (5) days prior to the term for which the jury is drawn. For good cause shown, the court may entertain the motion at any time thereafter.

"(b) The motion shall be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn.

"(c) If the motion states facts which show that the jury panel has been improperly selected or drawn, it shall be the duty of the court to conduct a hearing. The burden of proof shall be on the movant.

"(d) If the court finds that the jury panel was improperly selected or drawn, the court shall order the jury panel discharged and the selection or drawing of a new panel in the manner provided by law."

At the outset we note defendants have failed to comply with section 95-1908. Defendants raised the issue of improper jury selection and drawing in a timely and specific manner, but the district court record fails to disclose the submission of any affidavit in support of the allegation. Defense counsel contend, on oral argument before this Court, that the timely submission of a supporting affidavit, required by section 95-1908, was prohibitive since counsel lacked the means of determining the manner in which the jury panel was selected and drawn. Absent such knowledge, defense counsel conclude the filing of affidavits before this Court at the time of appeal is sufficient. We disagree.

The district court file clearly reveals that at least one defense

counsel was cognizant of the provisions of section 95-1908. The motion of defendant Bad Horse to discharge the jury panel states:

"COMES NOW the Defendant, PAUL BAD HORSE, JR., and moves the Court to Discharge the Jury Panel herein pursuant to Section 95-1908, R.C.M.1947.

"Said motion will be supported by affidavit when the jury panel is selected and made known to this defendant.

"Dated this 29th day of August, 1975."

A summary of count 9 charges that Jack M. Scanlon, falsely testified that Grace A. Rieker first contacted him on the telephone, when in turth and fact he knew that he had instigated the telephone conversation with claimant for the prupose of initiating a client-attorney relationship; and that he so testified to deceive and frustrate the grand jury in its investigation contrary to section 94-7-202, R.C.M.1947.

A summary of count 10 charges that defendant falsely testified that prior to the telephone call from claimant he had never heard of the claimant nor the fact that she was injured, while in truth and fact he knew the claimant and that she had been injured prior to ever talking to her, and he so testified for the purpose of cedeiving and frustrating the grand jury contrary to section 94-7-202, R.C.M.1947.

■ The gist of count 9 is the contradictory statements of attorney Scanlon and Mrs. Rieker as to who called the other first. Scanlon claims she called him first and she claims that Scanlon called her first. A determination must be made whether attorney Scanlon's testimony, if false, was material to the grand jury investigation; that is, would it be reasonable to find that the defendant's statement, if believed, could have altered the course of the investigation. Section 94-7-202(3), R.C.M.1947, provides that "* * * Whether a falsification is material in a given factual situation is a question law." Accordingly, we must determine if the testimony was material. We conclude that it was not.

The focus of the grand jury inquiry was to determine if there were any personnel within the Industrial Accident Board who were

leaking information concerning claimants' cases to certain attorneys. The testimony elicited from Mr. and Mrs. Rieker and from attorney Scanlon must be weighed in light of this inquiry: Was anyone within the Industrial Accident Board referring claimants to attorney Scanlon, or were they providing him with the names of potential clients?

The testimony centers around Mrs. Rieker, a secretary-receptionist at the Boulder River School in Boulder; Ron Fuller, the principal of Jefferson County High School in Boulder; and attorney Scanlon. Fuller and Scanlon are close personal friends dating back to high school days. Fuller and Mrs. Rieker were casual acquaintances in Boulder. Mrs. Rieker's industrial accident claim occurred at the school when she slipped on the steps and sustained back or neck injuries. Fuller had no connection with the Industrial Accident Board which handled claims sustained by injured workers.

Mrs. Rieker testified that it was Ron Fuller, and him alone, who twice suggested that she obtain a lawyer to handle her claim. On the first occasion she claims Fuller told her she should see a lawyer, and he would help her get one. On the second contact made by Fuller she claims that Fuller telephoned her and asked her if she would like to talk to attorney Scanlon who was with Fuller at the time. She claims she did talk to Scanlon and he later came over to her house to discuss her case.

There was no evidence that Mrs. Rieker became a client of Scanlon as a result of inside contacts Scanlon had with the Industrial Accident Board. There was no evidence that personnel of the Industrial Accident Board were referring possible clients to Scanlon or providing him with the names of potential clients. After Mrs. Rieker testified that it was Fuller who furnished the contact with attorney Scanlon, there was simply no evidence that personnel of the Industrial Accident Board had leaked information concerning Mrs. Rieker to attorney Scanlon. However, when Scanlon was later called before the grand jury, they wanted to know who had first done the contacting. Did Mrs. Rieker contact attorney Scanlon first or did Scanlon contact her first?

Regardless of the answer given to this question by Scanlon, it would not have affected the outcome of the proceedings or misled the grand jury in its investigation into possible leaks from the Industrial Accident Board. If they chose to believe Mrs. Rieker, they could conclude that Fuller telephoned her on behalf of attorney Scanlon and then put Scanlon on the phone to talk to her about her accident claim. If they chose to believe Scanlon they could conclude that Mrs. Rieker went to him on her own volition and that he could not recall how she happened to call him as an attorney. Neither conclusion suggests a leak to Scanlon from the Industrial Accident Board. It is clear that Scanlon's testimony was not material to the grand jury's inquiry.

■ Count 9 must be dismissed for yet another reason. Mrs. Rieker's testimony that attorney Scanlon called her first was not corroborated by admissible evidence. There was only the direst testimony of Mrs. Rieker that Scanlon called her first. The only attempted corroboration was testimony from Mrs. Rieker's husband that his wife told him that attorney Scanlon had called. It is manifest that section 93-1401-2, R.C.M.1947, which sets out the requirement of corroboration, contemplates only admissible corroboration. Here, the testimony was not admissible because it was hearsay and because it attempted to obtain corroboration from the same witness who was the source of the direct evidence.

In *State v. Newman*, 162 Mont. 450, 457, 513 P.2d 258, 262, we defined hearsay as follows:

"* * * 'Hearsay' is testimony or evidence of someone's words or conduct outside the court, when offered in court to prove the truth of the thing being asserted, and thus resting for its value upon the credibility of the out-of-court asserter."

Here, the state attempted to use the statement made by Mrs. Rieker to her husband to prove that Scanlon had actually called Mrs. Rieker on the telephone. Its credibility rested not on Mr. Rieker but on Mrs. Rieker. This plainly is hearsay.

The vice of this kind of evidence is even more apparent when considered in relation to the kind of proof needed for a prima facie

case of perjury. To allow the testimony of Mr. Rieker as corroboration would be to fly in the face of Montana statues requiring corroboration. Section 93-401-1, R.C.M.1947, provides that the direct testimony of one person is not sufficient to prove the crime of perjury. Section 93-1401-2, R.C.M.1947, requires that "* * * perjury [must be proved] by the testimony of two witnesses, *or one witness and corroborating circumstances.*" (Emphasis and bracketed material added.) Mrs. Rieker was the only person who testified directly that attorney Scanlon had called her first and so there was a need for corroborating circumstances.

To be admissible, the corroborative evidence must be independent of the testimony of the same witness who is the source of the direct evidence. See, for example, *United States v. Freedman*, 445 F.2d 1220 (2nd Cir 1971); *United States v. Thompson*, 379, F.2d 625 (6th Cir. 1967) and *United States v. Rose*, 215 F.2d 617 (3rd Cir 1954), which cases engraft a requirement of corroboration onto the federal perjury statute. Here, the grand jury had to rely on the direct testimony of Mrs. Rieker that attorney Scanlon had called her first, but also, for corroboration, it had to rely on her indirect testimony by virtue of her husband testifying to what she told him. What Mrs. Rieker told her husband is not corroboration under the perjury statute.

For these reasons count 9 must be dismissed.

Count 10 concerns the nature of the proof required for a charge of perjury, specifically, the requirement of direct evidence. The gist of count 10 concerns a conflict as to whether attorney Scanlon knew of Mrs. Rieker's compensation claim before the first time he talked to her about the case. Scanlon claims he did not; Mrs. Rieker claims he did. Regardless of who is right, there is no direct evidence as required by section 93-1401-2 to establish a prima facie case.

The only evidence concerning attorney Scanlon's prior knowledge of Mrs. Rieker's claim came from Mr. and Mrs. Rieker. They testified Scanlon told them he knew of Mrs. Rieker's claim before he talked to her on the telephone. However, this is not direct

evidence. Rather, under section 93-301-10, R.C.M.1947, it is indirect evidence. That section provides:

"Indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish that fact, but which affords an inference or presumption of its existence. For example, a witness proves an admission of the party to the fact in dispute. This proves a fact from which the fact in dispute is inferred."

Under this statute any statement made to them by Scanlon is in the nature of an admission and, therefore, is indirect evidence of the fact sought to be proved. The result is that there is no direct evidence to sustain a prima facie case of perjury as required by section 93-1401 and 93-1410-2, R.C.M.1947. There being no direct evidence, count 10 must also be dismissed.

Defendant has raised other issues in his petition for rehearing, but in light of our holding, we find no need to discuss them.

Counts 9 and 10 are ordered dismissed and the dismissal order of the district court is affirmed in its entirety.

■ Count 9 must be dismissed for yet another reason. Mrs. Rieker's testimony that attorney Scanlon called her first was not corroborated by admissible evidence. There was only the direct testimony of Mrs. Rieker that Scanlon called her first. The only attempted corroboration was testimony from Mrs. Rieker's husband that his wife told him that attorney Scanlon had called. It is manifest that section 93-1401-2, R.C.M.1947, which sets out the requirement of corroboration, contemplates only admissible corroboration. Here, the testimony was not admissible because it was hearsay and because it attempted to obtain corroboration from the same witness who was the source of the direct evidence.

In *State v. Newman,* 162 Mont. 450, 457, 513 P.2d 258, 262, we defined hearsay as follows:

"* * * 'Hearsay' is testimony or evidence of someone's words or conduct outside the court, when offered in court to prove the truth of the thing being asserted, and thus resting for its value upon the credibility of the out-of-court asserter."

Here, the state attempted to use the statement made by Mrs. Rieker to her husband to prove that Scanlon had actually called Mrs. Rieker on the telephone. Its credibility rested not on Mr. Rieker but on Mrs. Rieker. This plainly is hearsay.

The vice of this kind of evidence is even more apparent when considered in relation to the kind of proof needed for a prima facie case of perjury. To allow the testimony of Mr. Rieker as corroboration would be to fly in the face of Montana statues requiring corroboration. Section 93-401-1, R.C.M.1947, provides that the direct testimony of one person is not sufficient to prove the crime of perjury. Section 93-1401-2, R.C.M.1947, requires that "* * * perjury [must be proved] by the testimony of two witnesses, *or one witness and corroborating circumstances.*" (Emphasis and bracketed material added.) Mrs. Rieker was the only person who testified directly that attorney Scanlon had called her first and so there was a need for corroborating circumstances.

■ To be admissible, the corroborative evidence must be independent of the testimony of the same witness who is the source of the direct evidence. See, for example, *United States v. Freedman*, 445 F.2d 1220 (2nd Cir 1971); *United States v. Thompson*, 379, F.2d 625 (6th Cir. 1967) and *United States v. Rose*, 215 F.2d 617 (3rd Cir 1954), which cases engraft a requirement of corroboration onto the federal perjury statute. Here, the grand jury had to rely on the direct testimony of Mrs. Rieker that attorney Scanlon had called her first, but also, for corroboration, it had to rely on her indirect testimony by virtue of her husband testifying to what she told him. What Mrs. Rieker told her husband is not corroboration under the perjury statute.

For these reasons count 9 must be dismissed.

■ Count 10 concerns the nature of the proof required for a charge of perjury, specifically, the requirement of direct evidence. The gist of count 10 concerns a conflict as to whether attorney Scanlon knew of Mrs. Rieker's compensation claim before the first time he talked to her about the case. Scanlon claims he did not; Mrs. Rieker claims he did. Regardless of who is right, there is no

direct evidence as required by section 93-1401-2 to establish a prima facie case.

The only evidence concerning attorney Scanlon's prior knowledge of Mrs. Rieker's claim came from Mr. and Mrs. Rieker. They testified Scanlon told them he knew of Mrs. Rieker's claim before he talked to her on the telephone. However, this is not direct evidence. Rather, under section 93-301-10, R.C.M.1947, it is indirect evidence. That section provides:

"Indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish that fact, but which affords an inference or presumption of its existence. For example, a witness proves an admission of the party to the fact in dispute. This proves a fact from which the fact in dispute is inferred."

Under this statute any statement made to them by Scanlon is in the nature of an admission and, therefore, is indirect evidence of the fact sought to be proved. The result is that there is no direct evidence to sustain a prima facie case of perjury as required by section 93-1401 and 93-1410-2, R.C.M.1947. There being no direct evidence, count 10 must also be dismissed.

Defendant has raised other issues in his petition for rehearing, but in light of our holding, we find no need to discuss them.

Counts 9 and 10 are ordered dismissed and the dismissal order of the district court is affirmed in its entirety.

MR. CHIEF JUSTICE HATFIELD, and JUSTICES DALY and HASWELL, concur.

MR. JUSTICE HARRISON, dissenting:

I dissent. As the author of the earlier 4-1 opinion of this Court from which this rehearing was granted, I find no reason to change that opinion.

Two recent opinions of the United States Supreme Court considering perjury before a grand jury are if import in consideration of the instant case. Both were decided on May 23, 1977: *United*

States v. Wong,—U.S.—, 97 S.Ct. 1823, 52 L.Ed.2d 231; United States v. Washington,—U.S.—, 97 S.Ct. 1814, 52 L.Ed.2d 238.

In *Wong*, the Court reversed the suppression of testimony of a Chinese woman of limited education given to a grand jury concerning illegal gabling and obstruction of state and local law enforcement.

Referring to its holding in *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212, the Court, in *Wong*, noted:

"* * * the Fifth Amendment privilege does not condone perjury. It grants a privilege to remain silent without risking contempt, but it 'does not endow the person who testified with a license to commit perjury." *Glickstein v. United States*, 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128 (1911). The failure to provide a warning of the privilege, in addition to the oath to tell the truth, does not call for a different result. The contention is that warnings inform the witness of the availability of the privilege and thus eliminates the claimed dilemma of self-incrimination or perjury. Cf. *Garner v. United States*, 424 U.S. 648, 657-658, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). However, in *United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), the Court held that even the predicament of being forced to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury. * * *"

In *Washington* the Court overruled a lower court's judgment granting a motion to suppress grand jury testimony and quashing an indictment on the ground that it was based on evidence obtained in violation of Fifth Amendment privileges against self-incrimination. The Court held:

"* * * But this Court has not decided that the grand jury setting presents coercive elements which compel witnesses to incriminate themselves. Nor have we decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses; moreover, we have no occasion to decide these matters today, for even assuming that the grand jury setting exerts some pressures on witnesses generally or on those who may later be in-

dicted, the comprehensive warnings respondent received in this case plainly satisfied any possible claim to warnings. Accordingly, respondent's grand jury testimony may properly be used against him * * *."

Further, in *Washington*, as in the instant case, the defendant argued that having to invoke the Fifth Amendment before the grand jury placed him at a disadvantage in the eyes of the grand jury. This argument entirely overlooks the fact that the grand jury's historic role is as an investigative body; it is not an arbiter of guilt or innocence. Moreover, it is well settled that invocation of Fifth Amendment privilege in a grand jury proceeding is not admissible in a criminal trial, where guilt or innocence is actually at stake. *United States v. Wong*, supra.

The same holding and reasoning should, in my opinion, be applied here. This is a case that in my opinion should have been tried to a jury. They, not this Court, should have decided the fact question.

MR. JUSTICE SHEA, commenting on the dissent:

Since writing this opinion a dissent has been prepared and filed.

I strongly support the right and the need for dissenting opinions, but it seems to be that it should be responsive to the facts and law of the case.

This case does not concern itself in any form with the suppression of testimony before a grand jury, and therefore, the *Wong* case and the *Washington* case cited, quoted and discussed in the dissent are simply not applicable. And, neither does the invocation of the Fifth Amendment, as in the *Washington* case, have anything to do with the facts of law of this case, except perhaps as a procedural and historical aside.

It should be noted that the dissenter wrote the original majority opinion in this case dismissing 16 of the 18 counts, but ordering a trial on counts 9 and 10. In the original opinion, the facts were not applied to the law of perjury, and that is the reason for the original mistake on counts 9 and 10. Specifically, the test of materiality was

never applied to the facts of count 9. And, neither in count 9 was the requirement of corroboration applied to the facts, i. e., the corroborating evidence must be admissible evidence and not hearsay as in this case, and the corroborating evidence must be independent of the direct evidence. In count 10 the direct evidence requirement for proof of perjury was not applied to the facts of count 10.

The true test of the validity of this dissent, can, I believe, be summarized as follows: If the dissent would reverse the district court, then on what counts and for what legal reasons? On these matters the dissent is silent.